CASE 16—PETITION EQUITY—FEBRUARY 20.

# Joe Henry (of color) vs. Graves.

APPEAL FROM SHELBY CIRCUIT COURT.

1. A slave who, with his master, removed to, and became a resident of, Illinois, became thereby free, under the ordinance of 1787.

2. That such slave, whilst an infant, returned with his master to Kentucky, did not prejudice his right to freedom.

T. B. & J. B. COCHRAN, for appellant, cited *Ordinance of 1787*; 2 *Marsh.*, 467; 3 *Mon.*, 104; 8 *B. Mon.*, 545.

C. M. HARWOOD, for appellee, cited 13 *B. Mon.*, 251; 7 *B. Mon.*, 635; 9 *B. Mon.*, 569; 12 *B. Mon.*, 545.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

The appellant, *Joseph Henry*, once the slave of *Peter Mathews*, sued the appellee, *W. H. Graves*, for his freedom, claimed as the legal consequence of his removal from Kentucky in 1856, by his owner, and his co-residence with him in the State of Illinois, for about six months.

The circuit court, adjudging him still a slave, dismissed his petition, and that decision, now to be revised, presents a double question of law and of fact.

1. The fundamental "Ordinance of 1787" declared, that neither slavery nor involuntary servitude should ever exist in the then northwestern territory of the United States, which includes the present State of Illinois, whose constitution recognizes and confirms that provision of the territorial ordinance. That constitutional inhibition did not change the effect nor modify the principle of the ordinance adopted for the same purpose. The true constructive object of the ordinance was only to prohibit, within the defined territory, slavery as a domestic institution. Looking at the prospective Union, then, in a hopeful incubation, and at the obvious importance of harmony and free intercommunication, social and commercial, between the nascent co-States, the Confederate Congress of 1787 could not consistently be presumed

to have contemplated any such disturbance and injustice as the involuntary emancipation of the slaves of citizens of the slaveholding States as an inexorable consequence of either the flight of slaves to any portion of the territory thus consecrated to universal freedom, or of their compulsive or voluntary accompaniment of their owners thither on a temporary visit to it or transit through it.    This rational and wholesome interpretation is made conclusive as to fugitive slaves by a provision of the Federal constitution, and appears to us quite as obvious as to visits and transits of slaves as the attendants of their masters.    The only consistent or conservative purpose of the ordinance, in this respect, was to prevent the institution of slavery or the fixed residence of master and slave within the circumscribed limits of the declared occlusion, and thereby prevent the people of that territory from ever legalizing slavery as in the slaveholding States—as virtually adjudged by this court in the cases of *Rankin vs. Lydia,* 2d *A. K. M.,* 467; *Bush vs. White,* 3d *Mon.,* 104; *Graham vs. Strader, &c.,* 5th *B. Mon.,* 173; *Davis vs. Tingle, &c.,* 8th *Ib.,* 546; *Collins vs. America,* 9th *Ib.,* 569; *and Maria vs. Kirby,* 12th *Ib.,* 545.

2. Then is the fact of residence in Illinois well established? Do the facts show that the domicile of the appellant and his master was ever in the State of Illinois?    We think they do. Some of Matthews' fugitive and equivocal intimations might be so understood as to indicate that he never contemplated a permanent settlement in Illinois, and less than a year after his temporary sojourn there he voted in Kentucky, on his own *jurat* that he never resided in Illinois.    But other and much more satisfactory testimony proves many *res gestæ* declarations of contemplated and subsequently actual residence there with the *animo manendi;* and the uncontradicted evidence shows that he went to Illinois in the fall of the year 1855, for the avowed purpose of seeing the country and of buying land; that, after his return home, he went again, carried the appellant with him, bought or rented land, left Joe, the appellant, there, to raise a small crop and cultivate about two acres of garden vegetables—came back to Kentucky to

marry, and in May, 1856, returned to Illinois with his wife—and remained there until the succeeding August, when, becoming dissatisfied, he came back to Kentucky with his wife and Joe, where he remained until his death, a short time afterwards—having said more than once that Joe was free. These facts, fairly considered, conduce sufficiently to show, that, for about six months, both master and slave were, in fact, domiciled in Illinois, and were, therefore, in both fact and law, residents of Illinois for that period. And Joe, being a minor, cannot be affected in any of his resulting rights by his return to Kentucky, even if voluntary.

Such a continued residence of Joe, as a slave, was, in our opinion, interdicted by the spirit, as well as the letter, of the ordinance; and, therefore, he became, *ipso facto*, free.

Wherefore, the judgment of the circuit court dismissing his petition is reversed, and the cause remanded for further proceedings and judgment conformable with this opinion.